**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| JOAQUIN HOLMES,<br><br>        Plaintiff,<br><br>        - against -<br><br>CENTURION CORRECTIONAL HEALTHCARE OF NEW MEXICO, LLC; MHM HEALTH PROFESSIONALS, INC.; MURRAY YOUNG, M.D., DIETER DENNIG, M.D., NORTHWEST NEW MEXICO CORRECTIONAL FACILITY (NWNMCF) f/n/a CORRECTIONS CORPORATION OF AMERICA, INC., NWNMCF DIRECTOR OF NURSING, and NWNMCF SITE MEDICAL DIRECTOR, CENTRAL NEW MEXICO CORRECTIONAL FACILITY (CNMCF), CNMCF SITE MEDICAL DIRECTOR and CNMCF DIRECTOR OF NURSING, NEW MEXICO CORRECTIONS DEPARTMENT, DAVID JABLONSKI, DAVID SELVAGE, ORION STRADFORD, STEVE MADRID, CENTRAL NEW MEXICO CORRECTIONAL FACILITY CNMCF LT. CRAIG COLE, SGT. MARTIN JARAMILLO, AND NURSE TIFFANY PERALTA; CORECIVIC, INC., JOHN/JANE DOE NWNMCF GRIEVANCE OFFICER.<br><br>        Defendants. | No. _____<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

        COMES NOW Plaintiff Joaquin Holmes ("Mr. Holmes"), by his attorneys, Collins & Collins, P.C. and Guebert Gentile & Piazza P.C., and pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201 and 2202, brings this action (the "Complaint") to redress violations of Mr. Holmes' Eighth and Fourteenth Amendment rights under the United States Constitution, and alleges, based on personal knowledge as to his own experiences and otherwise on information and belief, as follows:

## PRELIMINARY STATEMENT

1.     While housed at Northwest New Mexico Correctional Facility ("NWNMCF"), CoreCivic, Inc., F/N/A Corrections Corporation of America, Inc., ("CoreCivic"), New Mexico Corrections Department ("NMCD"), Centurion Correctional Healthcare of New Mexico, LLC ("Centurion"), and MHM Health Professionals, Inc. ("MHM"), acting through their respective employees, staff, agents, and assigns named above in their individual capacities, knew that Mr. Holmes was at a high risk of developing osteomyelitis and sepsis and that he was suffering from increasingly severe and debilitating pain. Defendants deliberately and recklessly ignored an emergent infection and Mr. Holmes' high risk of osteomyelitis and sepsis manifested by increasingly severe, escalating, and debilitating pain from May 1, 2019, to September 9, 2019, which was treated only with ibuprofen.

2.     The result of Defendants' deliberate indifference to Mr. Holmes' serious medical condition and severe pain was an 8-day hospitalization at UNMH hospital and permanent spinal damage and consequent disabilities.

3.     Upon discharge from UNMH to the Central New Mexico Correctional Facility ("CNMCF") Long Term Care Unit ("LTCU"), Defendants continued in the deliberate medical neglect of Mr. Holmes while also engaging in cruel and callous behavior with the intent to inflict emotional distress upon Mr. Holmes.  The intentional and callous behavior achieved the goal of causing severe emotional distress to Mr. Holmes.

4.     The above-named Defendants, engaged in a conspiracy to violate Mr. Holmes' Eight Amendment protections against cruel and unusual punishment by deliberating denying Mr. Holmes necessary medical care.

5.      Mr. Holmes' injuries were, in part, the result of Centurion's widespread pattern and practice of failing to provide constitutionally adequate medical care and effectively denying patients access to medical care and NMCD's longstanding pattern and practice of complicity in the reckless refusal of medical care and deliberate indifference of its medical contractors in their long-standing failure to provide constitutionally adequate medical care to NMCD inmates.

6.      The actions and inactions of Defendants violated Mr. Holmes' rights secured by 42 U.S.C. § 1983 under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

7.      This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

8.      Subject matter jurisdiction is conferred by 28 U.S.C. §§ 1331 and 1343(a).

9.      This Court has personal jurisdiction over each of the entity and individual Defendants because, upon information and belief, all Defendants are domiciled in the State of New Mexico (the "State") and/or have substantial contacts in the State of New Mexico and purposefully availed themselves of conducting business in New Mexico.

10.     Venue is proper here under 28 U.S.C. § 1391(b)(2), because, upon information and belief, a majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

11.     Plaintiff need not exhaust any administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), because Mr. Holmes is not currently incarcerated.

## PARTIES

12.     Joaquin Holmes is a citizen of the United States and New Mexico, presently domiciled in Rio Arriba County, Chimayo, New Mexico. During all times relevant to this Complaint, Mr. Holmes was in the custody of NMCD, housed at NWNMCF in Cibola County, Grants, NM until he was transferred to UNMH.  Upon discharge from UNMH, he was housed in the LTCU at CNMCF in Valencia County, Los Lunas, New Mexico.

13.     Defendant Centurion is a domestic limited liability company registered to do business in New Mexico, whose registered agent for service of process is CT Corporation System, 206 S. Coronado Avenue, Española, New Mexico, 87532-2792. Centurion, by the terms of General Services Contract #16-770-1300-0097 ("GSC"), was contracted by NMCD for the purposes of providing medical care to inmates in the NMCD prison system, including Mr. Holmes. The term of the GSC began on June 1, 2016, and ended on or about November 1, 2019. The GSC was to end on June 1, 2020, under a one (1) year extension but ended prematurely.

14.     Under the GSC, Centurion was acting as the apparent and actual agent, servant, and contractor of NMCD and was responsible for the care, health, safety, and proper medical treatment of all inmates in NMCD's facilities, including Mr. Holmes. Pursuant to the GSC, NMCD adopted Centurion's policies, practices, habits, customs, procedures, training, and supervision as its own, and Centurion adopted NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own. Centurion acted by and through its employees, staff, agents, and assigns who are named in their individual capacities.

15.     Defendant MHM is a Delaware for-profit corporation that contracted to supply medical personnel to Centurion for the purpose of providing medical services to NMCD prisoners,

including Mr. Holmes. Through the "Health Services Addendum Between MHM Professionals, Inc. and Centurion Healthcare of New Mexico, LLC," MHM acted as a subcontractor to the contract between Centurion and NMCD.

16.     MHM was acting as the apparent and actual agent, servant, and contractor of NMCD whose employees, staff, and agents were responsible for the care, health, safety, and proper medical treatment of all inmates in NMCD's facilities, including Mr. Holmes. Pursuant to MHM's contract with Centurion as a subcontractor under the GSC, MHM adopted Centurion's and NMCD's policies, practices, habits, customs, procedures, training, and supervision as its own, and NMCD and Centurion adopted MHM's policies, practices, habits, customs, procedures, training, and supervision as their own.

17.     At all material times, Centurion and MHM acted through their owners, officers, directors, employees, agents, or apparent agents, including, but not limited to, administrators, management, nurses, doctors, technicians, and other staff, and is responsible for their acts or omissions pursuant to the doctrines of *respondeat superior*, agency and/or apparent agency.

18.     Dieter Dennig, M.D., was at relevant times an employee of MHM working through and under the direction of Centurion.  Upon information and belief, Dr. Dennig was the site medical director and/or the Authorized Medical Authority for NWNMCF.

19.     CoreCivic, Inc. (formerly Corrections Corporation of America, Inc) was under contract with NMCD to operate the NWNMCF.  At all relevant times, NWNMCF was operated by CoreCivic of Tennessee, Inc.  CoreCivic is a Foreign for-Profit Corporation registered to do business in New Mexico whose registered agent is in Albuquerque, New Mexico.

20.     NMCD retains ultimate authority over NWNMCF, and NWNMCF is operated in

accordance with NMCD rules, policies, and procedures.

21.    NMCD is responsible for contracting medical services for all NMCD facilities including NWNMCF.

22.    At all material times, NMCD acted through its contractors, administrators, officers, directors, employees, agents, or apparent agents, and was responsible for their acts or omissions pursuant to the doctrines of *respondeat superior*, agency, and/or apparent agency.

23.    David Jablonski was serving as the Secretary of Corrections at all times relevant to this Complaint.    As the Secretary of Corrections, Mr. Jablonski oversaw prison operations, including NMCD's duty to provide a safe environment at NWNMCF, and to ensure that inmates have access to adequate medical care.

24.    David Selvage was at all times, relevant to this Complaint, serving as the Health Services Administrator ("HSA") for NMCD. As HSA for NMCD, Mr. Selvage maintained direct clinical oversight over independent medical contractors, ensuring that NMCD contractors provided adequate care to NMCD inmates, including those at NWNMCF and specifically Mr. Holmes.

25.    Orion Stradford was at all times, relevant to this Complaint, serving as the NMCD Bureau Chief.  As NMCD Bureau Chief, Mr. Stratford was responsible for monitoring the work of independent contractors, including CoreCivic, MHM, and Centurion, and acted as NMCD's supervisor over its independent contractors.

26.    Steve Madrid was at all times, relevant to this Complaint, the individual acting on behalf of NMCD in charge of the NMCD Grievance Process, including the appellate process.  As the individual in charge of NMCD's Grievance Process, Steve Madrid serves as the "gatekeeper"

between inmates and their access to adequate healthcare.  As the gatekeeper, if Mr. Madrid does not responsibly manage the grievance process, inmates have no way of accessing necessary, proper, and competent medical care from its medical contractors, which in this case was Centurion. Mr. Madrid during his tenure with very rare exceptions never found in favor of an inmate on a medical grievance.

27.    Lieutenant Craig Cole was the Unit Manager for the Long-Term Care Unit at CNMCF.  The Long-Term Care Unit is an inpatient skilled care (Infirmary) with 24-hour-a-day nursing services.[1]  Lt. Cole has a history of abusive conduct toward LTCU patients, all of whom are suffering from serious illnesses.  Lt. Cole was abusive toward Mr. Holmes with the intent to inflict severe emotional distress on Mr. Holmes.

28.    Sergeant Martin Jaramillo worked in the LTCU.  Despite being an inpatient infirmary designed to provide 24-hour nursing services, Sgt. Jaramillo would restrict Mr. Holmes' access to the nurses and other medical care.  Despite having knowledge of Mr. Holmes' deteriorating medical condition, and despite having knowledge of Mr. Holmes' spinal pain and inability to move, Sgt. Jaramillo ignored Mr. Holmes' requests for help and denied access to medical care.

29.    The as of yet unidentified Grievance Officers at NWNMCF was an employee of either CoreCivic or NMCD.  Upon information and belief, the Grievance Officer, against NMCD Policy, also served as disciplinary officer (*see* CD-150500 and CD-150501).  The Grievance Officer has a duty to properly process and act upon medical grievances.  The Grievance

---

[1] http://unmhospitalist.pbworks.com/w/page/80448455/2014%20Los%20Lunas%20Correctional%20Facility%20-%20Medical%20Services%20Available

Officer deliberately ignored Mr. Holmes' medical grievances.

30.     NMCD governs, operates, and maintains NWNMCF, while independent contractors carry out discrete duties at the discretion of NMCD.

31.     NMCD Defendants have a duty to reasonably and prudently operate the medical facility within NWNMCF.

32.     By the terms of the GSC, NMCD maintained authority over Centurion through its authority to terminate the contract with or without cause as indicated by the GSC.

33.     Any of the above named NMCD individuals can intercede on behalf of NMCD if independent contractors are not appropriately caring for NMCD inmates.

34.     Any of the above named NMCD individuals can intercede on behalf of an inmate to act on a medical grievance.

35.     None of the above-named NMCD individuals interceded to protect Mr. Holmes from the deliberate indifference of Centurion and the Grievance Officer at NWNMCF.

36.     Defendant Dr. Murray Young was an employee of Centurion acting as medical director with authority over all Centurion medical operations within NMCD facilities. Dr. Young was responsible for the care, health, safety, and proper medical treatment of Mr. Holmes. He was an agent of Centurion and NMCD, acting within the scope of his employment at all times relevant to this lawsuit.

37.     At all times relevant to this Complaint, each of the above-named Defendants was an employee and/or agent of a New Mexico state-run entity or a private medical service responsible for treating State prisoners, a task which was ultimately the responsibility of the State.

Accordingly, all Defendants were acting under color of state law at all relevant times.

38.     All individually named defendants are sued in their individual and official capacities.

**FACTUAL BACKGROUND**

I.   **MR. HOLMES DISPLAYED AND COMPLAINED OF SEVERE PAIN FOR MORE THAN FOUR MONTHS BEFORE FINALLY BEING TRANSFERRED TO A HOSPITAL, WHERE HE SUBSEQUENTLY WAS DIAGNOSED WITH OSTEOMYELITIS AND SEPSIS.**

39.     Joaquin Holmes was a 35-year-old male, incarcerated at the New Mexico Corrections Department ("NMCD") with a history of IV drug abuse and lumbar osteomyelitis in 2018.

40.     Mr. Holmes started complaining of back pain on May 1, 2019.

41.     Mr. Holmes' pain escalated over time affecting his ambulation and ability to engage in daily activities from August 14, 2019, until his transfer to UNMH on September 9, 2019.

42.     He requested medical attention for his severe backache several times as noted below:

        a)     On August 16, 2019, in a sick call, Mr. Holmes mentioned that he had extreme back pain, disc pain, and nerve pain. He was not able to get out of bed. His upper torso was twisted. He was not able to get out of bed on August 14, 2019, August 15, 2019, and August 16, 2019.

        b)     On August 20, 2019, in a sick call, Mr. Holmes mentioned that he had severe back pain, and he was not able to get out of bed.

        c)     On August 22, 2019, in a sick call, Mr. Holmes mentioned that he had serious back problems requiring immediate medical attention.

d)     He had been told 2 weeks prior that he could see a doctor, but he did not receive help of any kind.

e)     On August 22, 2019, he also reported that he had unbearable pain in the sciatic nerve causing his body to shut down.

f)     On August 22, 2019, it was documented that Mr. Holmes was complaining of pain, tingling, and numbness in his legs. He was unable to walk.

g)     On September 4, 2019, during a telemedicine visit it was noted that Mr. Holmes had chronic back pain and it was again noted that he was unable to walk.

h)     On September 4, 2019, Mr. Holmes was advised for evaluation at UNMH.

i)     Mr. Holmes was not transferred to UNMH for evaluation on September 4, 2019.

j)     On September 5, 2019, in a sick call, Mr. Holmes again reported severe back pain but still there was no response.

k)     On September 5, 2019, Mr. Holmes reported severe impairment to his mobility.

l)     Still, Mr. Holmes was not transferred to UNMH for evaluation.

m)     On September 9, 2019, Dr. Dennig at NWNMCF noted that Mr. Holmes had chronic low back pain for 3 weeks, that the pain was radiating to his left leg, and that Mr. Holmes was unable to walk for 2 weeks, Dr. Dennig assessed Mr. Holmes with Cauda Equina Syndrome and referred Mr. Holmes to UNMH emergency room.

n)     The September 9, 2019, consultation with Dr. Dennig was the first time that Mr. Holmes was allowed to see a doctor despite repeated and increasingly desperate requests.

o)     Mr. Holmes was admitted to UNMH on September 9, 2019, where he remained hospitalized until September 17, 2019, at which time he was released back to NMCD custody to the LTCU at CNMCF where he remained from September 17, 2019, to November 14, 2019.

p)     Mr. Holmes returned to UNMH on December 31, 2019, and was discharged on January 1, 2020.

43.    Despite persistent and repeated complaints of severe back pain, difficulty in ambulation, known risk factors for osteomyelitis, and clear indicators of osteomyelitis for at least 24 days from his first report of severe back pain on August 16, 2019, to September 9, 2019, Mr. Holmes was denied critical medical care. What little "medical care" that was provided was so deficient as to amount to no medical care at all.

44.    Rather than properly diagnose and treat Mr. Holmes, throughout this entire period, the Centurion medical staff at NWNMCF simply took his vitals, declared nothing was wrong with him, stating that there was nothing that could be done to help him, and sent him back to his pod in increasingly severe and debilitating pain.

45.    From his first report of severe back pain on August 16, 2019, to his admission to UNMH on September 9, 2019, Mr. Holmes was never provided with pain management other than Ibuprofen.

46.     Mr. Holmes, throughout this time period until the day of the transfer to UNMH, never saw a medical doctor, instead being diagnosed by nurses in plain violation of prohibitions on nurses providing medical diagnosis.

47.     The nurses treated Mr. Holmes as a drug-seeking malinger ignoring his severe pain which reflected a very dangerous life-threatening infection.

48.     The as-of-yet unidentified Director of Nursing at NWNMCF and Dr. Dennig allowed unqualified nurses to diagnose Mr. Holmes time and time again.

49.     Dr. Dennig refused or otherwise failed to ever see Mr. Holmes for 24 days as Mr. Holmes' health deteriorated to the point that he could not walk.  Dr. Dennig as Site Medical Director showed a complete lack of interest or concern for Mr. Holmes' health and safety despite the fact that osteomyelitis is common in NMCD facilities, particularly at NWNMCF where Dr. Dennig is, upon information and belief, the Site Medical Director.

50.     Dr. Dennig, despite the prevalence of osteomyelitis, the complaints of severe crippling pain and the clear indicators of possible spinal osteomyelitis, was utterly indifferent to Mr. Holmes' critical emergent life-threatening infection, seeing Mr. Holmes only once after 24 days of disease progression to spinal osteomyelitis and sepsis.  Dr. Dennig's failure to provide any medical care at all to Mr. Holmes led to extensive avoidable hospitalization along with severe and permanent spinal damage.

51.     Upon information and belief, on-site medical personnel including medical doctors and directors of nursing cannot make a referral to an outside medical provider without prior corporate approval through the Utilization Management/Review process (Utilization Management).  Upon information and belief, the referral of Mr. Holmes to the ER was

never made until it was too late to avoid severe and permanent harm in order to avoid the costs of a referral to an outside provider.

52.    Murray Young, M.D., at all relevant times to this complaint, was in charge of Utilization Management for NWNMCF and NMCD more broadly. Dr. Young had final decision-making authority short of a rebuttal filed by an onsite medical provider.

53.    Jeannie Shackleton was the Utilization Management Nurse and participated in the Utilization Management process along with Dr. Young.

54.    Jeff Keller, upon information and belief, was the chief medical officer for all of NMCD facilities.  He had final decision-making authority if a medical provider contested a referral refusal.

55.    Murray Young, Jeannie Shackleton, and Jeff Keller determined when an NMCD inmate could be transferred to outside medical providers, including the ER, infectious disease specialists, and orthopedic specialists.

56.    In making that determination, they utilized software that was modeled on insurance industry standards for approval of referrals.  The software was automated.  Nurses input data into the software for the purposes of beginning the referral process.  Referrals could be and were automatically refused based upon the software's automated processes.

57.    NMCD medical facilities had very limited capabilities.  Some had no capability to provide X-rays.  None had the capability to perform blood cultures, CT scans, or MRIs which were necessary for the effective diagnosis of osteomyelitis and sepsis.

58.     Medical providers and medical staff could not make referrals to outside providers without first going through the Utilization Management process no matter what diagnostic and treatment limitations existed at the facility.

59.     Medical records and notes documentation were severely deficient and remain so. There is no Electronic Health Records system (EHR) despite the fact that the GSC states that an EHR is necessary for constitutionally adequate medical care. Notes and signatures are often illegible. Medical staff would neglect to put notes in charts. Yet, Dr. Young took no significant corrective action and never put in a Corrective Action Plan in New Mexico for any medical staff or medical providers.

60.     Daily and weekly calls were held but individual patient charts were not discussed. Instead, only ER runs were discussed suggesting that these calls were profit rather than patient-care-driven.

61.     Weekly calls were held where notable cases were discussed.  Despite a high number of cases of osteomyelitis and infective endocarditis (heart infections) in 2019, of which Dr. Young and Dr. Dennig were well aware, only one osteomyelitis case was addressed during the weekly calls and no cases of endocarditis or other severe infections other than MRSA were discussed.

62.     For both daily and weekly calls, there were no sign-in sheets, no record of attendance, and no notes or minutes taken.

63.     NMCD was also aware of the high number of cases of osteomyelitis and endocarditis and did nothing to intervene to protect NMCD inmates from these potentially deadly infections.

64.    Centurion has represented time and time again that it is not involved in the NMCD medical grievance system suggesting a callous indifference to the deficient medical care provided by NMCD to inmates.

65.    The harm to Mr. Holmes could have been avoided had Dr. Dennig, the Director of Nursing made a simple referral and had Dr. Young approved the referral to an outside specialist for proper diagnosis and treatment.

66.    The failure to make a referral to an outside specialist such as an orthopedic doctor, infectious disease doctor, pain management specialist, or a myriad of other medical professionals that could have readily diagnosed osteomyelitis and begun an appropriate course of treatment, reflects a widespread pattern of deliberate indifference on the part of both Centurion and NMCD.

67.    In fact, the refusal to refer inmate patients to outside medical providers are a standard operating procedure for Centurion and NMCD in case of emergent infections, osteomyelitis, endocarditis, brain infection, and other life-threatening illnesses.

68.    Medical staff at NWNMCF acted and failed to act with reckless disregard and deliberate indifference to Mr. Holmes' serious medical needs as follows:

    a)  Failing to obtain a diagnosis by a medical doctor and instead relying on diagnoses by nurses unqualified to diagnose osteomyelitis.

    b)  In addition to a lack of training and expertise to diagnose osteomyelitis, nursing regulations prohibit nurses from making medical diagnoses, yet nursing staff did.

    c)  Failure, based upon cost considerations, to refer Mr. Holmes to an outside medical provider for proper diagnosis and treatment despite knowing that NWNMCF lacked

the diagnostic capability to accurately diagnose emergent spinal osteomyelitis and sepsis.

d)  Failure to provide proper pain management despite Mr. Holmes' well-documented reporting of extreme debilitating pain.

e)  Refusal or deliberate failure of any medical doctor at NWNMCF to ever examine Mr. Holmes until the emergent infection had progressed to spinal osteomyelitis and sepsis requiring hospitalization at UNMH.

**II.  AFTER RECEIVING WEEKS OF CRITICAL CARE AT UNMH, MR. HOLMES WAS DISCHARGED TO NMCD'S LONG TERM CARE UNIT (LTCU) WHERE HE SUFFERED FURTHER DELIBERATE DENIAL OF MEDICAL CARE AND WANTON CRUELTY.**

69.    Upon discharge from UNMH to the LTCU at CNMCF on September 17, 2019, after eight (8) days of hospitalization, Defendants continued to deny appropriate medical care and ignored Mr. Holmes' medical condition.

70.    Despite extensive hospitalization, continuing illness, PICC line, and confinement to bed, Mr. Holmes was unable to obtain medical attention when necessary.

71.    Upon calling the nursing station with his call button, correctional officers rather than nurses or other medical professionals would come to his room.

72.    The correctional officers, most notably Lt. Craig Cole and Sgt. Jaramillo would actively prevent Mr. Holmes from seeing the LTCU nurses.

73.    This was precipitated by the nurses themselves, most notably Nurse Tiffany Peralta, who upon information and belief was acting in a supervisory capacity in the LTCU.

74.    Nurse Peralta simply had a distaste for her inmate patients, seeming to avoid them the best she could.  This was illustrated in numerous ways including the fact that she even refused

to hand medications to the patients in Mr. Holmes' room but rather threw them all on a table for the inmates to sort out themselves knowing they could not walk.

75.    Likewise, Nurse Peralta would often place medication outside of Mr. Holmes' reach, despite knowing that he could not walk to get the medication.

76.    Nurse Peralta and Lt. Cole engaged in ridicule, mocking, and other verbal and emotional abuse of Mr. Holmes, and other patients. This behavior was callous, wanton, and cruel with the intention of causing severe emotional distress to Mr. Holmes, and other inmate patients.

77.    This emotional and psychological abuse is consistently reported by NMCD inmates.  In fact, it has been reported by correctional officers working alongside Centurion.

III.   **CENTURION DEMONSTRATED A PERSISTENT AND WIDESPREAD PATTERN AND PRACTICE OF DELIBERATE INDIFFERENCE TO THE SERIOUS MEDICAL NEEDS OF INMATE PATIENTS UNDER ITS CARE**

78.    Centurion maintained various widespread patterns and practices which violated Mr. Holmes' constitutional rights directly causing his severe injuries, hospitalization, and permanent disability including: (1) failing to report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions; (2) delaying or denying patient referrals to necessary emergency or other offsite medical services; (3) severely understaffing its medical and mental health facilities; (4) failing to provide adequate medical documentation or communicate changes in patient conditions to the appropriate correctional officers and/or medical or mental health staff; (5) failing adequately to train and supervise its employees and agents on procedures necessary to protect patients' health, (6) callous indifference to the pain of inmate patients.

79. In essence, Centurion's medical care of NMCD prisoners effectively amounted to no medical care at all. *Kikumura v. Osagie*, 461 F.3d 1269, 1295 (10th Cir 2006) (finding sufficient deliberate indifference allegations where "the medical treatment [plaintiff] received was merely a façade . . . [and] so cursory as to amount to no treatment at all") (internal cites and quotes omitted); *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("[D]eliberate indifference to inmates' health needs may be shown by . . . proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.").

**A. Centurion had a pattern and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions, and of delaying or denying patients access to critical off-site medical services, which were contributing factors to Mr. Holmes' injuries.**

80. Centurion is currently under a consent decree in Arizona[2]. Centurion's failures in Arizona are remarkably similar to those in the care of Mr. Holmes:

   a) Failure to provide timely access to health care;

   b) Failure to provide timely emergency treatment;

   c) Failure to provide necessary medication and medical devices;

   d) Insufficient health care staffing;

   e) Failure to provide care for chronic diseases and protection from infectious disease;

   f) Failure to provide timely access to medically necessary specialty care;

---

[2] Stipulation at 16, Parsons v. Ryan, No. 2:12-CV-00601 (D. Ariz. Oct. 14, 2014).

81.     These same failures evidencing deliberate indifference to the serious medical needs of inmates have been exhibited time and time again in New Mexico in prisons and jails throughout the nation in which Centurion provides inmate medical care.

**B.      Centurion had a pattern and practice of severely understaffing its medical and mental health facilities, which was a moving force behind Mr. Holmes' injuries.**

82.     The fact of Centurion's chronic understaffing of medical positions during the time period leading up to Mr. Holmes' injuries is indisputable. It is widely known and documented. As emphasized in the October 23, 2018, New Mexico Legislative Finance Committee program evaluation of NMCD (the "Committee Report"): "Both state and contractor medical positions are frequently understaffed, threatening the quality of care provided. The Corrections Department's Office of the Medical Director, state employees who are responsible for overseeing the care, opportunities, and education necessary for patients to improve their health, including medical provider contract oversight, had a 25 percent vacancy rate as of October 2018." The staffing levels were from August 16, 2019, to September 9, 2019, but it is expected that the staffing levels during this time were equally low if not worse.

83.     Centurion's pattern and practice of severe understaffing was a contributing cause of the Constitutional violations concerning Mr. Holmes' medical treatment.

84.     Through the Committee Report and its own records of vacancies, Centurion was put on notice that this severe understaffing was substantially certain to cause Constitutional violations regarding its patients' medical treatment, yet it chose to disregard that risk and, for years, continued to display a pattern and practice of severe shortages in medical staff and mental healthcare providers.

85.    In this way, Centurion acted with deliberate indifference to prisoners' healthcare needs. *See, e.g., Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (finding deliberate indifference to prisoners' healthcare needs where "gross deficiencies in staffing" and procedures cause the prisoner population to be "effectively denied access to adequate medical care").

**C.    Centurion also had a pattern and practice of failing to provide adequate medical documentation and failing to communicate changes in patient conditions, both of which contributed to Mr. Holmes' injuries.**

86.    Centurion had a pattern of poor medical records documentation and maintenance.

87.    Additionally, Centurion has a pattern and practice of misplacing or otherwise failing to provide medical records for critical time periods leading up to the hospitalizations of its patients.

88.    Notably, the Committee Report referenced an audit of Centurion released in June 2018 that put Centurion on notice that its charts fell short of industry best practices, and some charts were "illegible or inaccurate, not filled out and submitted timely, and not used consistently." (**Exhibit 1** at 22). The Committee Report also emphasized that documentation of certain test results was missing, and intake forms were not completed for all prisoners as required. *Id.*

89.    The preceding cases and report, among others, establish that Centurion was on notice of these widespread unconstitutional practices prior to Mr. Holmes' injuries and thereby knew or should have known that additional safeguards should have been put in place to address the inadequate medical documentation and communication of changes in patient conditions.

90.    Accordingly, it can be inferred that Centurion intentionally failed to adequately document patient conditions and failed to adequately communicate changes in those conditions despite the known and obvious risk to patient safety.

91.     Centurion's widespread practice of failing to provide adequate medical documentation and communicate changes in patient conditions shares a close factual relationship with the events in Mr. Holmes' case, and accordingly, the widespread practice was the moving force behind his injuries.

92.     In fact, Dr. Murray Young himself, Statewide Medical Director for Centurion testified in another case to the inability to read numerous notes and signatures.

93.     Notably, Mr. Holmes' case alone reveals sufficient evidence of Centurion's widespread practice of providing inadequate medical documentation and communication about patient conditions. For example, in the months leading up to Mr. Holmes' hospitalization, medical staff failed to perform sufficient medical examinations and accompanying documentation at least seven times.  No medical doctor or equivalent, including Dr. Dennig and Dr. Young, ever reviewed Mr. Holmes' chart.

94.     Continuity of care, which is critical to patient diagnostics and treatment, simply had no role in Centurion medical practices in NMCD facilities, including NWNMCF for Mr. Holmes.

95.     The lack of continuity of care, proper medical records documentation, an EHR, and proper review of Mr. Holmes' medical chart by a qualified medical doctor all contributed to Mr. Holmes' injuries.  The utter lack of interest in continuity of care for Mr. Holmes, and other NMCD inmates, represent deliberate indifference to the serious medical needs of Mr. Holmes.

96.     Because Centurion personnel did not adequately document or otherwise communicate Mr. Holmes' rapidly deteriorating medical condition to the appropriate personnel, he was not provided with the medical treatment that he clearly needed, which caused him to sustain his injuries.

97.    Accordingly, Centurion's policy and practice of providing inadequate medical documentation and failing to communicate changes in patient conditions to appropriate personnel proximately caused Mr. Holmes' injuries.

**D.    Centurion Medical Staff Refuse to Provide Names and Titles to Patients**

98.    Centurion medical staff routinely refused to identify themselves to patients.

99.    Centurion even refuses to identify medical providers and signatures in discovery.

100.    These refusals are clearly intended to prevent inmates from identifying deliberately indifferent medical staff and providers.

**E.    Centurion failed to adequately train or supervise its individuals despite knowing that such training and discipline were necessary to protect patient health, and this failure was a moving force behind Mr. Holmes' injuries.**

101.    As outlined in the Committee Report, in 2018, the New Mexico Medical Review Association conducted an audit of Centurion's medical services in prisons and recommended that staff be better educated by both Centurion and NMCD on chart documentation standards and consistency and in completing prisoner intake forms correctly. *Id*. According to Centurion's auditors, the need for additional training and supervision was apparent and should have been prioritized.

102.    Similarly, the extensive violations of proper protocol in Mr. Holmes' case provide compelling evidence that Centurion had a widespread pattern and practice of failing to adequately train and supervise its personnel. As discussed in more detail above, Centurion medical staff failed to conduct necessary diagnostic and physical examinations in at least seven instances over the course of a few months as Mr. Holmes' medical condition worsened.

103.    As such, Centurion's widespread failures to train and supervise its personnel were a primary cause of the Constitutional violations suffered by Mr. Holmes. Each of Centurion's failures to conduct necessary examinations deprived Mr. Holmes of the opportunity to be evaluated, diagnosed, and to be prioritized in receiving the medical treatment that he so desperately needed. Because medical personnel were not adequately trained or supervised to ensure that the proper medical procedures were followed, Mr. Holmes never received the opportunity to obtain critical medical care until his medical condition had become life-threatening. Consequently, he sustained the injuries that resulted in his extensive hospital stay, severe injuries, and permanent disability.

104.    Training and supervision regarding proper medical treatment protocol and documentation were required because, as Centurion knew or should have known to a moral certainty, Centurion's personnel would commonly confront situations where they would need to assess the severity and emergency nature of patients' medical conditions, particularly emergent infections developing into spinal osteomyelitis and sepsis.

105.    Additionally, documenting and assessing the next steps in a patient's medical treatment is precisely the type of complex and important decision that requires training and supervision, as making the wrong choice in these instances will frequently cause the deprivation of prisoners' constitutional rights.

106.    As evinced by Mr. Holmes' situation and the others cited in subsection A of this section, Centurion's widespread pattern of deficient training and supervision presents an obvious potential to violate patients' Constitutional rights, because there has been a history where prisoners

are denied serious medical care to which they are entitled, and they suffer from long-term disability or death as a result.

107.    Defendants required inmates to submit a Health Services Request before they could see any type of medical provider.  The Health Services Request was sent to the nurses on duty, the "nurses were the first line of treatment."  **Exhibit 2**, Deposition of Murray Young, M.D., 174:7.

108.    It would take at least three "of the same complaints" on a Health Services Request to "trigger a provider review."  **Exhibit 2**, Deposition of Murray Young, M.D., 174:15-16.

109.    Yet, despite being the first line of treatment, nurses were not trained to identify signs and symptoms of diseases like osteomyelitis, such that would trigger a provider review. Thus, inmates such as Mr. Holmes were never able to see a physician.

110.    Moreover, nurses, despite prohibitions on nursing medical diagnoses, were de facto making such diagnoses for Mr. Holmes when they continually denied that he was ill.

111.    The result was that Mr. Holmes was provided no medical care at all for a very serious life-threatening emergent infection.

112.    The failure to train nurses on the recognition of emergent infections and signs of osteomyelitis and sepsis has led to numerous severe injuries, permanent disabilities, and deaths of NMCD inmates.  Dr. Murray Young's testimony in the case of *Martinez v. Centurion, NMCD, et al.*[3] clearly illustrates the lack of training and skills necessary to diagnose and treat emergent osteomyelitis:

> **Well, I think most of those occurrences were, again, nursing.  It wasn't a -- a**
> **provider only saw him once…Nurses aren't built to make a diagnosis like**
> **that.  So that's not what -- you know, the nurses aren't trained to make those**
> **diagnoses, which I think is what you're after.  I'm not gonna throw my**

---

[3] D-101-CV-2020-00488.

**nurses under the bus. They do a good job.  But they're not going to know, you can't possibly train a nurse to ferret out osteomyelitis and endocarditis when a patient has these** issues**.  It's just not gonna happen.  Exhibit 2,** Deposition of Murray Young, M.D., 191:13-25, 192:1-8.

113.    Nurses lack the training and skills to identify possible osteomyelitis yet remain unsupervised by a medical doctor to ensure that proper diagnoses are made.  Rather, as in this case, the nurses simply repeatedly take vitals, declare the inmate healthy, state that nothing can be done, and send the inmate patient back to their cell or pod.

114.    Given the testimony of Dr. Young, it is not surprising that Centurion failed to report, diagnose, and treat emergent osteomyelitis, sepsis, endocarditis, and brain infections as the nurses, who work without proper supervision by medical doctors, are not trained nor "built for" identifying these life-threatening conditions.  It happened before Mr. Holmes, and it continues with NMCD to this time:

A.    *Estate of David Vigil v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed January, 4, 2018, involved the failure to diagnose an emergent infection leading to endocarditis, lengthy hospitalization and ultimate death.

B.    *Sisneros v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*,  filed March, 5, 2019, involved failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal diskitis with osteomyelitis with extensive hospitalization.

C.    *Deherrera v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed March 7, 2019, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal osteomyelitis (discitis osteomyelitis with epidural abscess).

D.    *Mora-Solis v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*,  filed March 7, 2019, failure to diagnose and treat

pressure ulcer of paraplegic inmate leading, and failure to refer leading to multiple, lengthy hospitalizations.

E.   *Yribe v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed  March 7, 2019, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal osteomyelitis (discitis osteomyelitis with epidural abscess).

F.   *Wilson v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed March 14, 2019, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal osteomyelitis (discitis osteomyelitis with epidural abscess).

G.   *Finch v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed March 22, 2019, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal discitis and osteomyelitis with multiple lengthy hospitalizations.

H.   *Gabriel Miera v. Centurion et al.,* filed, April 11, 2019, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal osteomyelitis with epidural abscess.

I.   *Estate of Efrain Martinez v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed  March 5, 2020, failure to diagnose and treat emergent infection leading, failure to refer to an outside provider in a timely manner resulting in endocarditis (heart infection), lengthy hospitalization and death.

J.   *Padilla v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed  November 25, 2020, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in osteomyelitis in the leg requiring lengthy hospitalization and ultimate below knee amputation.

K.   *Holmes v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed  November 30, 2020, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal osteomyelitis with lengthy hospitalization.

L.   *William Killen v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed February 10, 2021 , failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in septic emboli, endocarditis (heart infection) and lengthy hospitalization.

M.   *Pino v. New Mexico Corrections Department, Centurion Correctional Healthcare, et al.*, filed March 5, 2021, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner despite a medical history of septic arthritis resulting in septic arthritis, posterior leg abscess, osseous sequela of chronic septic arthritis, and acute kidney damage

N.   *Robinson v. Centurion Correctional Healthcare of New Mexico, New Mexico Corrections Department, et al.*, filed August 31, 2021, , failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in spinal diskitis with osteomyelitis with extensive hospitalization

115.   Among these cases, eight (8) involved NWNMCF:  Ayala, Holmes, DeHerrera, Padilla, Finch, Yribe, Sisneros, and Jaramillo.  These were all under the watch of Centurion, Dr. Murray Young, Dr. Dieter Dennig, the NWNMCF Director(s) of Nursing and Centurion's Chief Medical Officer believed to be Jeff Keller at times relevant to this Complaint.

116.   The preceding cases and others illustrate Centurion's persistent refusal to refer inmate patients out to third-party medical providers for the provision of care unavailable through Centurion within NMCD's facilities.

117.   Centurion was replaced by Wexford in November 2019.  The same practices continue with no interventions by NMCD to protect its inmates.  The following cases have been filed against Wexford Health Sources, Inc.  Each involves deliberate indifference to emergent infections and pain.  The continuation of these practices by an NMCD its n1ew medical contractor illustrate NMCD's utter lack of interest or regard for the health and safety of NMCD inmates.

Simply put David Selvage, David Jablonski, Orion Stradford along with their predecessors and successors, have illustrated callous, cruel, and deliberate indifference to the serious medical needs of NMCD inmates.  This deliberate indifference was a moving force leading to the injuries of Mr. Holmes and represents a continuing threat to all NMCD inmates:

A.   *Martin v. New Mexico Corrections Department, Wexford Health Sources, Inc., et al.*, filed October 19, 2021, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in osteomyelitis/discitis with partial vertebral collapse, kyphosis and severe sepsis

B.   *Ayala v. Wexford Health Sources, New Mexico Corrections Department, et al.*, filed  October 27, 2021, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in infective endocarditis, severe sepsis secondary to presumed bacteremia, multiple pulmonary septic emboli, splenic infarct and multiorgan failure (acute heart failure and acute kidney injury) with lengthy hospitalization.

C.   *Jimenez v. New Mexico Corrections Department, Wexford Health Sources, Inc., et al.*, filed November 10, 2021, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in acute aortic valve infective endocarditis, severe sepsis, acute aortic regurgitation, pulmonary edema, elevated LFTs, heart failure with reduced ejection fraction,  presumed bacteremia, troponinemia likely due to demand ischemia, bilateral pulmonary edema leading to death.

D.   *Hallum v. New Mexico Corrections Department, Wexford Health Sources, Inc, et al.*, filed May 6, 2022, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in endocarditis (heart infection), multiple hospitalizations and multiple heart surgeries.

E.   *Melendrez v. New Mexico Corrections Department, Wexford Health Sources, Inc. et al.*, filed July 5, 2022, failure to diagnose and treat emergent infection, failure to refer to an outside provider in a timely manner resulting in long-term ear infection, leading to permanent hearing loss.

118.    Upon information and belief, Centurion's widespread failure to refer prisoners for off-site medical care was, in large part, financially motivated, as Centurion was contractually obligated to pay $0.00 for any hospitalization lasting 24 hours or more. (**Exhibit 3**, Centurion Correctional Healthcare of New Mexico, LLC's Responses to Plaintiff's Third Request for Production).

119.    Upon information and belief, Centurion paid $0.00 for numerous prisoners' medical bills even though their hospitalizations were extensive. Evidently, this fee structure incentivized Centurion to refrain from referring prisoners for off-site care unless and until there was a substantial certainty that the prisoners would require a minimum 24 hour hospital stays.

120.    The preceding cases, among others, also establish that Centurion was on notice of these widespread unconstitutional practices prior to Mr. Holmes' injuries and thereby knew or should have known that additional safeguards should have been put in place to address patients' signs of serious medical and mental health conditions.

121.    Accordingly, it can be inferred that Centurion intentionally failed to report, diagnose, and treat these serious warning signs despite the known and obvious risk to patient safety.

122.    Centurion's widespread practice of failing to report, diagnose, and treat the warning signs of serious medical and mental health conditions shares a close factual relationship with the events in Mr. Holmes' case, and accordingly, the widespread practice was the moving force behind his injuries and death.

123.    Significantly, Centurion personnel failed to conduct diagnostic and physical examinations at least seven times in Mr. Holmes' case alone,[4] which establishes a pattern and practice of insufficient reporting, diagnoses, and treatment of serious medical conditions.

124.    As such, Centurion's policy and practice of failing to report, diagnose, and treat warning signs of serious medical and mental health conditions proximately caused Mr. Holmes' injuries.

125.    Centurion was alerted to an obvious deficiency in its training and supervision through the many prior lawsuits against it alleging unconstitutional medical care. It was also put on notice of these deficiencies through the 2018 audit results requiring that it provide better training and oversight of its personnel.

126.    Centurion's failure to do so is further evidence of its deliberate indifference to the Constitutional violations caused by its widespread deficiencies in training and supervising.

## IV.    **Centurion Has a Pattern of Dehumanizing Prisoners**

127.    NMCD inmates have reported dehumanizing, cruel and callous treatment by Centurion medical personnel including:

A.  Referring to inmates as "pussies" and "bitches" when they complain of pain or illness.
B.  Telling inmates to get out of wheelchairs, again referring to them as "pussies" and "bitches", and that they do not need it.
C.  Taking wheelchairs and walkers from inmates.
D.  Ridiculing inmates.
E.  Treating inmates as drug seekers rather than the critically ill individuals that they are.
F.  Discussing private health information in the presence of other inmates.

---

[4] Centurion staff received notice of Mr. Holmes' severe pain and poor medical condition on the following days in 2019, yet they failed to conduct diagnostic and physical examinations: 5/1/19, 8/16/19, 8/20/19, and 8/22/19.

128.    Correctional personnel have affirmed the dehumanizing treatment of Centurion personnel in other settings.

## V.    **NMCD/LTCU**

129.    Upon discharge from UNMH to the LTCU at CNMCF, the intentional and deliberate medical neglect recommenced despite the fact Mr. Holmes had required 8 days of hospitalization to begin to correct the prior deliberate indifference to his serious medical needs.

130.    Mr. Holmes was released from UNMH on a Peripherally Inserted Central Catheter (PICC) due to the need to keep his infection under control.  He was bedridden and remained in severe pain.  He was vulnerable both physically and emotionally.  The nurses and correctional staff did not hesitate to prey on that vulnerability.

131.    Because Mr. Holmes was bedridden, on a PICC line and unable to ambulate, he had a call button in his room.  He shared his room with two other inmate patients.

132.    When Mr. Holmes or the other two patients would press the call button, it was not a nurse or medical professional that would show up but a correctional officer.

133.    The correctional officers that showed up most of the time were Sgt. Martin Jaramillo and Lt. Craig Cole.  Both Sgt Jaramillo and Lt. Cole actively prevented Mr. Holmes, and his roommates, from seeing nurses or other medical professionals.

134.    Lt. Cole was particularly aggressive toward Mr. Holmes and his roommates (and other LTCU patients).  Lt. Cole was verbally abusive and physically threatening toward Mr. Holmes despite Mr. Holmes extremely vulnerable physical condition.  Lt. Cole deliberately and intentionally caused extreme emotional distress to Mr. Holmes.

135.    In addition to her utter refusal to provide care to Mr. Holmes and his roommates, Nurse Tiffany Peralta was extremely abusive verbally.  She refusal to provide care and her verbal abuse of Mr. Holmes including accusing him and a cellmate of PREA violations for assisting one another when the nurses would not help.  Peralta's behavior was intended to and did cause extreme emotional distress to Mr. Holmes.

## VI.    <u>Medical Grievance Obstruction</u>

136.    The Grievance Officer at NWNMCF, believed to be a CoreCivic employee, also served as the Disciplinary Officer in Mr. Holmes case which is against NMCD policy CD-150500 and CD-150501, which states that "No inmate or employee who is named in the grievance shall participate in any capacity in the investigation or resolution of the grievance…"

137.    Mr. Holmes filed numerous grievances at NWNMCF.  The Grievance Officer refused to respond to Mr. Holmes' grievances.  When Mr. Holmes inquired into the status of his medical grievances, the Grievance Officer refused to discuss them, instead insisting on discussing disciplinary matters.

138.    Mr. Holmes also filed medical grievances while at the LTCU.  These too were ignored.  An as of yet unidentified LTCU mental health worker offered to and did make copies of grievances for Mr. Holmes for his records telling Mr. Holmes that his medical grievances would never be processed properly or ever leave the LTCU.

139.    There is a long-standing pattern of ignoring medical grievances on the part of NMCD and its contractors.

## VII.    <u>DAMAGES SOUGHT</u>

140.    The grossly negligent, reckless, and deliberately indifferent refusal of medical care for Mr. Holmes' emergent spinal infection led to the following harm:

b)    Prolonged severe debilitating yet untreated back pain for 24 days.

c)    Persistent pain even after IV antibiotics likely due to persistent osteomyelitis.

d)    Development of persistent vertebral osteomyelitis non-responsive to IV antibiotics with probable need for a spinal surgery in future.

e)    Neurological symptoms in lower extremities.

f)    Prolonged or lifelong need of supportive devices for ambulation in the form of a cane or a wheelchair.

141.    Loss of chance for a better outcome had the emergent infection not been deliberately trivialized and ignored. As a direct result of Defendants' unlawful conduct, Mr. Holmes endured tremendous pain, injuries, anguish, suffering, and loss of chance entitling him to general and special compensatory damages.

142.    Further, Plaintiff is entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988, in addition to pre-judgment interest and costs as allowed by federal law.

143.    Plaintiff is also entitled to punitive damages against NMCD personnel and Centurion, as their actions were done with malice or, minimally, with reckless indifference to Mr. Holmes' federally protected rights.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
8th and 14th Amendments to the U.S. Constitution
Deliberate Indifference to Serious Medical Need (42 U.S.C. § 1983)
(against Centurion, MHM, Dr. Dieter Dennig, Dr. Murray Young, John/Jane Doe Director
of Nursing, Nurse Tiffany Peralta, Sgt. Martin Jaramillo, Lt. Craig Cole, and Doe Officers
1-2 in their individual capacities)

144.    Each paragraph of this Complaint is incorporated as if fully restated herein.

145.    The above-named Defendants each possessed responsibility for the decisions that resulted in the violation of Mr. Holmes' constitutional right to be free from cruel and unusual punishment regarding the deliberate indifference to his serious medical needs while in NMCD custody, as described more fully above.

146.    These Defendants were aware of and deliberately disregarded the substantial risk of harm to Mr. Holmes that would ensue because of their failures to provide him with constitutionally adequate medical care, as described more fully above. Among other things, these Defendants were made aware of Mr. Holmes' substantial risk of harm due to his persistent expressions of intolerable and worsening pain, including chest pain specifically; his frail physical appearance; and his inability to digest foods and liquids for days.

147.    The deliberate indifference of the above-named Defendants caused Mr. Holmes to experience worsening, extensive, and unnecessary pain (first harm) and suffer from a delayed diagnosis of infective osteomyelitis and sepsis (second harm), which resulted in a diagnosis of severe sepsis and acute encephalopathy due to central nervous system perivasculitis from the osteomyelitis and sepsis (third harm). Ultimately, these harms resulted in causing extensive hospitalization, severe injuries and permanent disability.

148.    Mr. Holmes' harms were sufficiently serious injuries that a reasonable doctor or patient would find them important and worthy of immediate treatment. Without treatment, Mr. Holmes' worsening severe pain caused him to lose the ability to take care of his most basic needs so that he could not even stand or consume food and water. His subsequently diagnosed medical conditions were life-threatening, ultimately causing extensive hospitalization, severe injuries and permanent disability. Accordingly, Mr. Holmes' severe pain and medical condition significantly affected his daily activities.

149.    The above-named Defendants are not shielded by qualified immunity for their deliberate indifference to Mr. Holmes' serious medical needs because of the well-documented 10th Circuit precedent notifying medical and prison personnel that the Eighth Amendment is violated when such personnel fail to take reasonable measures to provide a patient with access to medical attention and/or deny medical care to a patient with serious medical needs, as occurred in Mr. Holmes' case with each of the Defendants named herein. *See, e.g., Sealock v. Colorado,* 218 F.3d 1205 (10th Cir. 2000) (confirming that prison personnel violate the Eighth Amendment when a prisoner complains of chest pain, a sign of medical emergency, yet prison personnel delay taking him to a hospital, even if the delay is only several hours).

## SECOND CLAIM FOR RELIEF:
### 8th and 14th Amendments to the U.S. Constitution
### Conspiracy to Unlawfully Interfere with Medical Treatment (42 U.S.C. § 1983)
### (against Centurion, MHM, Dr. Murray Young, John/Jane Doe Director of Nursing, Nurse Tiffany Peralta, Sgt. Martin Jaramillo, Lt. Craig Cole, and Doe Officers 1-2 in their individual capacities)

150.    Each paragraph of this Complaint is incorporated as if fully restated herein.

151.    The above-named Defendants each possessed responsibility for the decision to remove Mr. Holmes from life sustaining medical treatment, which resulted in the violation of

Mr. Holmes' constitutional right to be free from cruel and unusual punishment regarding the deliberate indifference to his serious medical needs while in NMCD custody, as described more fully above.

152.    Accordingly, these Defendants unlawfully interfered with Mr. Holmes' medical treatment while being aware of and deliberately disregarding the substantial risk of harm to Mr. Holmes that would ensue because of their failures to provide him with constitutionally adequate medical care.

153.    The deliberate indifference of the above-named Defendants caused Mr. Holmes severe permanent harm, thereby violating his Eight Amendment rights.

154.    Centurion and its employees are not entitled to qualified immunity.  Private companies and private employees are never entitled to qualified immunity, even when engaged in work delegated to them by the State. *See, e.g., Phillips v. Tiona*, 508 Fed. Appx. 737, 751-52 (10th Cir. 2013).

### <u>THIRD CLAIM FOR RELIEF:</u>
**8th and 14th Amendments to the U.S. Constitution**
**Policy & Practice of Denial of Medical Care (42 U.S.C. § 1983)**
**(against Centurion, David Jablonski, David Selvage, Orion Stradford, Steve Madrid)**

155.    Each paragraph of this Complaint is incorporated as if fully restated herein.

156.    As a private corporation acting pursuant to its agreement with NMCD to provide medical services to New Mexico State prisoners, Centurion was at all times relevant to the events described in this Complaint acting under color of law and, as the provider of healthcare services to prisoners incarcerated at NWNMCF and CNMCF, was responsible for the creation, implementation, oversight, and supervision of all policies and procedures followed by employees and agents of Centurion and PNM/NMCD.

157.    Mr. Holmes' injuries were proximately caused by the policies and practice of Centurion and NMCD (acting through the individually named NMCD defendants).

158.    Centurion, and NMCD by and through its employees and staff, maintain a policy, practice, and custom of under-reporting the severity of medical and mental health emergencies and denying appropriate medical and mental health care to prisoners.

159.    At all times relevant to this Complaint, Centurion and NMCD by and through its employees had notice of a widespread practice by its employees and agents at NMCD facilities including NWNMCF and CNMCF under which prisoners with serious medical conditions, such as Mr. Holmes, were routinely denied access to proper or sufficient medication and medical attention. Upon information and belief, it was common to observe prisoners of NWNMCF and CNMCF with clear symptoms of serious medical and/or mental concerns whose requests for medical care were routinely denied or completely ignored. Upon information and belief, a significant portion of these denials of medical and mental health care resulted in substantial injury or death.

160.    More specifically, there was a widespread practice under which employees and agents of Centurion and NMCD, including correctional officers and medical personnel, failed or refused to: (1) report, diagnose, and properly examine and treat prisoners with serious medical and/or mental health conditions, including failing to provide proper medications to prisoners with serious medical and/or mental health conditions; (2) respond to prisoners who requested medical and/or mental health services; (3) respond to prisoners who exhibited clear signs of medical and/or mental health needs or illness; (4) adequately document and communicate the medical and mental

health needs of prisoners to the appropriate correctional officers and/or medical or mental health staff; or (5) timely refer prisoners for emergency or other offsite medical services.

161.    Additionally, there was a widespread practice under which Centurion personnel severely understaffed its medical and mental health facilities and failed adequately to train and supervise its personnel on necessary medical processes and procedures.

162.    These widespread practices were allowed to proliferate because Centurion directly encouraged, and was the moving force behind, the specific misconduct at issue. Centurion also failed to adequately train, supervise, and control medical personnel by failing to adequately discipline prior instances of similar misconduct, thereby directly encouraging future abuses like those which harmed Mr. Holmes.

163.    Centurion knew of the substantial risk of serious or fatal consequences that could be caused by its unconstitutional policies, practices, customs, failures to train, and failures to supervise, as occurred in Mr. Holmes' case.

164.    Centurion and NMCD through its employees and staff are s sued herein for maintaining these policies, practices, and customs; for failing to train and supervise; and for ratifying its employees' and agents' misconduct, all of which amounts to deliberate indifference to prisoners' serious medical and/or mental health needs.

165.    These policies and conduct were the moving force behind the violations of Mr. Holmes' constitutional rights and his injuries. Mr. Holmes' injuries were caused by employees and contractors of NMCD and Centurion, including but not limited to the individually named Defendants, who acted pursuant to the policies and practices of Centurion while engaging in the misconduct described in this Complaint.

166.    Upon information and belief, Centurion maintained these policies and practices in order to maximize profit and without regard to its constitutional and medical obligations to NMCD prisoners who were entrusted to Centurion's care.

167.    Centurion is not shielded by qualified immunity for its unconstitutional policies and practices, because private companies and their private employees are never entitled to qualified immunity, even when employed doing correctional work. *See, e.g., Phillips v. Tiona*, 508 Fed. Appx. 737, 751-52 (10th Cir. 2013).

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief against Defendants, jointly and severally:

(a)    Monetary damages against Centurion and individual Defendants sued under 42 U.S.C. § 1983 in their individual capacities in an amount to be determined at trial to compensate Plaintiff for the injuries he sustained as a result of the events and conduct alleged herein;

(b)    Punitive damages against all Defendants in an amount to be determined at trial;

(c)    Statutory interest on any and all damages awarded to Plaintiff;

(d)    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

(e)    Such other and further relief as the Court may deem just and proper, including injunctive and declaratory relief.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues in this case so triable.

Dated: October 18, 2022

Respectfully submitted,

COLLINS & COLLINS, P.C.


By: ___/s/ Parrish Collins_____
　　　Parrish Collins
　　　P.O. Box 506
　　　Albuquerque, NM 87103
　　　(505) 242-5958
　　　parrish@collinsattorneys.com

AND

GUEBERT GENTILE & PIAZZA P.C.


By:___/s/ Robert F. Gentile_____
　　　Robert F. Gentile
　　　Elizabeth M. Piazza
　　　P.O. Box 93880
　　　Albuquerque, NM 87199
　　　(505) 823-2300
　　　rgentile@guebertlaw.com
　　　epiazza@guebertlaw.com

　　　*Attorneys for Plaintiff*


F:\Clients\7200.016cf\Pleadings\Federal\Fed.Cmplaint.7200.016.MAM.Review.docx/krg